1  **MICHELLE BETANCOURT**
California State Bar No. 215035
2  **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
3  San Diego, CA 92101-5008
(619) 234-8467/Fax: (619) 687-2666
4  E-Mail: Michelle_Betancourt@fd.org

5  Attorneys for Jose Angel Garcia-Gonzalez

6

7

8                    UNITED STATES DISTRICT COURT

9                   SOUTHERN DISTRICT OF CALIFORNIA

                    **(HONORABLE BARRY T. MOSKOWITZ)**
10

11  UNITED STATES OF AMERICA,          )      Case No. 08CR0544-BTM
                                       )
12              Plaintiff,             )      DATE:        April 4, 2008
                                       )      TIME:        1:30 p.m.
13  v.                                 )
                                       )      STATEMENT OF FACTS AND
14  JOSE ANGEL GARCIA-GONZALEZ,        )      MEMORANDUM OF POINTS AND
                                       )      AUTHORITIES IN SUPPORT OF
15              Defendant.             )      DEFENDANT'S MOTIONS_____
                                       )
16  _____   )

17                              **I.**

18                     **STATEMENT OF FACTS**

19          The following statement of facts is based, in part, on materials received from the government.

20  Mr. Garcia-Gonzalez does not accept this statement of facts as his own, and reserves the right to take a

21  contrary position at motion hearings and trial. The facts alleged in these motions are subject to amplification

22  and/or modification at the time these motions are heard.

23          On February 11, 2008, Agent J. Fillipi received a "citizen report" about a possible load vehicle near

24  the San Diego Sheriff's Firearms Range on Alta Road in Otay Mesa, California. The "citizen" reporting the

25  alleged alien smuggling was Sheriff's Deputy Alvaro Marentes. Deputy Marentes reported that, while driving

26  an unmarked truck, he observed a silver Chevrolet Suburban parked on the shoulder of southbound Alta Road.

27  He also observed eight to ten people getting into the Suburban. Deputy Marentes saw one person pushing

28  people in through both the driver and passenger side door. Deputy Marentes then saw this same person climb

1   into the Suburban through the driver side door.  A description of his observation was broadcast indicating the

2   following:  vehicle description Chevy Truck, driver wearing a white baseball cap with long white sleeved

3   shirt.

4           Agent Fillipi relayed this report to Supervisory Border Patrol Agent J. Wallace.  Agent Wallace,

5   along with Agent Dailey,  responded to this report and proceeded to engage in a pursuit of the Suburban.

6   Agent Wallace and Agent Dailey followed the Suburban westbound on the 905 toward Interstate 5.  The

7   Suburban continued northbound on I-5.  While on I-5, the Suburban was traveling at approximately 90 miles

8   per hour.  Due to the driver's driving, Agent Wallace began to allow the Suburban to distance itself from the

9   unmarked units.  Although Agent Wallace was about one mile behind the Suburban he was able to see the

10  Suburban exit I-5 at the Miles of Cars exit in National City.  Agent Wallace followed but then lost sight of

11  the Suburban.

12          The Suburban was the observed and followed by Agent Ortiz and later Agents Soto and Blas.

13  Agents Soto and Blas observed the Suburban exit at 28th Street from State Route 94.  Agent Wallace

14  responded to the approximate area of where the Suburban was last seen.  Without seeing the Suburban or any

15  criminal activity afoot, Agent Wallace stopped Mr. Jose Angel Garcia-Gonzalez as he was walking

16  southbound toward E Street and 27th Street.  Mr. Garcia-Gonzalez was wearing a grey hooded sweatshirt,

17  *not* a white long sleeved shirt.  According to Agent Wallace, he stopped Mr. Garcia-Gonzalez  because he

18  was walking at a brisk pace and talking on a cell phone.  Also, Agent Wallace claimed that Mr. Garcia-

19  Gonzalez' eye enlarged upon seeing and that "he appeared very surprised by Agent Wallace's presence."

20          Without reading him his rights, Agent Wallace questioned Mr. Garcia-Gonzalez as to his citizenship

21  and his ability to remain in the United States legally.  Mr. Garcia-Gonzalez then admitted that he did not have

22  any legal documents that would allow him to remain in the U.S.  Agent Wallace then placed Mr. Garcia-

23  Gonzalez under arrest and proceeded to search him.  Agent Wallace recovered two cell phones.

24          Some time later, Agent Soto located the empty Suburban on 26th and Broadway.  Shortly after,

25  Agent Soto, along with Agent Desrosiers, observed two Hispanic males walking near the intersection of 25th

26  and Broadway.  Because one of the males was observed talking on his cell phone, Agents Soto and Desrosiers

27  got out of their unmarked vehicle and began to question the two individuals.  Without the benefit of <u>Miranda</u>,

28

1  both admitted they were citizens and nationals of Mexico with no legal right to remain in the United States.

2  One of them, later identified as the co-defendant Valentino, admitted he had just bailed out of the Silver

3  Suburban.  Both individuals were placed on under arrest.

4      The agents continued searching the area.  Agent Soto then walked through an alley way between

5  25th and 26th Street just south of C Street and began searching nearby dumpsters.  Agent Soto was able to

6  locate thirteen people hiding in a dumpster who admitted to having traveled in the Suburban.  Everyone was

7  transported to the Chula Vista Border Patrol Station for further processing.

8      Agent Wallace also transported Mr. Garcia-Gonzalez to the Chula Vista Border Patrol Station.  As

9  he arrived with Mr. Garcia-Gonzalez, Deputy Marentes, who had been waiting at the station, "immediately

10  recognized Mr. Garcia-Gonzalez as he exited [Agent Wallace's border patrol] vehicle."  Deputy Marentes

11  claimed that Mr. Garcia-Gonzalez was the driver that he had seen.

12      After being processed and questioned, Mr. Garcia-Gonzalez denied being the driver of the Chevy

13  Suburban.  Mr. Valentino did not recognize the photograph of Mr. Garcia-Gonzalez that was shown to him

14  by the interrogating officers.  Moreover, none of the material witnesses interviewed were able to identify the

15  driver of the Suburban.

16      On February 27, 2008, the Government filed a six-count indictment against Mr. Garcia-Gonzalez,

17  charging, in counts one, three and five, a violation of 8 U.S.C. § 1324(a)(2)(B)(ii) and 18 U.S.C. § 2, and in

18  counts two, four, and six, a violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and (v) (II).

19      These motions follow.

20  **II.**

21  **MOTION TO COMPEL DISCOVERY/PRESERVE EVIDENCE**

22      At this time, Mr. Garcia-Gonzalez has received 190 pages of discovery and 2 DVDs.  Mr. Garcia-

23  Gonzalez moves for the production of the following discovery.  This request is not limited to those items that

24  the prosecutor knows of, but rather includes all discovery listed below that is in the custody, control, care,

25  or knowledge of any "closely related investigative [or other] agencies."  See United States v. Bryan, 868 F.2d

26  1032 (9th Cir. 1989).

27

28

1       (1)   <u>The Defendant's Statements</u>.  The government must disclose to the defendant <u>all</u> copies of

2   any written or recorded statements made by the defendant; the substance of any statements made by the

3   defendant, which the government intends to offer in evidence at trial -- either in its case-in-chief or in rebuttal;

4   <u>see</u> <u>id.</u>, any response by the defendant to interrogation; the substance of any oral statements, which the

5   government intends to introduce at trial, and any written summaries of the defendant's oral statements

6   contained in the handwritten notes of the government agent; any response to any <u>Miranda</u> warnings, which

7   may have been given to the defendant; as well as any other statements by the defendant.  Fed. R. Crim.

8   P. 16(a)(1)(A)[1].  The Advisory Committee Notes and the 1991 Amendments to Rule 16 make clear that the

9   Government must reveal <u>all</u> the defendant's statements, whether oral or written, regardless of whether the

10  government intends to make any use of those statements.  Federal Rule of Criminal Procedure 16 is designed

11  "to protect the defendant's rights to a fair trial."  <u>United States v. Rodriguez</u>, 799 F.2d 649 (11th Cir. 1986);

12  <u>see also</u> <u>United States v. Noe</u>, 821 F.2d 604, 607 (11th Cir. 1987) (reversing conviction for failure to provide

13  statements offered in rebuttal -- government's failure to disclose statements made by the defendant is a serious

14  detriment to preparing trial and defending against criminal charges).  **This request includes, but is not**

15  **limited to, all recorded conversations.**

16      (2)   <u>Arrest Reports and Notes</u>.  The defendant also specifically requests that the government turn

17  over all arrest reports, notes, TECS records, dispatch tapes, audio tapes, and video tapes not already produced

18  that relate to the circumstances surrounding his arrest or any questioning.  This request includes, but is not

19  limited to, any rough notes, records, reports, transcripts, referral slips, or other documents in which statements

20  of the defendant or any other discoverable material is contained.  Such material is discoverable under Fed.

21  R. Crim. P. 16(a)(1)(A) and <u>Brady v. Maryland</u>.  The government must produce arrest reports, investigators'

22  notes, memos from arresting officers, sworn statements, and prosecution reports pertaining to the defendant.

23  *See* Fed. R. Crim. P. 16(a)(1)(B) and (C), 26.2 and 12(I); <u>United States v. Harris</u>, 543 F.2d 1247, 1253 (9th

24  Cir. 1976) (original notes with suspect or witness must be preserved); <u>see also</u> <u>United States v. Anderson</u>, 813

25  F.2d 1450, 1458 (9th Cir. 1987) (reaffirming <u>Harris</u>' holding).

26  _____

27      [1]  Of course, any of Mr. Garcia-Gonzalez's statements, which are exculpatory, must be
    produced, as well.  <u>See</u> <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

28

1       (3)  <u>Brady Material</u>.  The defendant requests all documents, statements, agents' reports, and

2   tangible evidence favorable to the defendant on the issue of guilt and/or which affects the credibility of the

3   government's case.  <u>Kyles v. Whitley</u>, 514 U.S. 419 (1995).  Under <u>Brady</u>, <u>Kyles</u> and their progeny,

4   impeachment, as well as exculpatory evidence, falls within the definition of evidence favorable to the

5   accused.  <u>See also</u> <u>United States v. Bagley</u>, 473 U.S. 667 (1985); <u>United States v. Agurs</u>, 427 U.S. 97 (1976).

6   This includes information obtained from other investigations which exculpates Mr. Garcia-Gonzalez.

7   Moreover, Mr. Garcia-Gonzalez request all information regarding the immigration status of the material

8   witness; a complete criminal history report of the material witness; and any reports of investigation, prior

9   statements, prior arrest, etc. of the material witness.  **This requests includes, but is not limited to, all**

10  **reports and notes regarding arrests/apprehensions that involved the same Chevy Suburban as indicated**

11  **in the reports.**

12      (4)  <u>Any Information That May Result in a Lower Sentence Under The Guidelines</u>.  The

13  government must also produce this information under <u>Brady v. Maryland</u>.  This request includes any

14  cooperation, or attempted cooperation, by the defendant, as well as any information, including that obtained

15  from other investigations or debriefings, that could affect any base offense level or specific offense

16  characteristic under Chapter Two of the Guidelines.  The defendant also requests any information relevant

17  to a Chapter Three adjustment, a determination of the defendant's criminal history, and information relevant

18  to any other application of the Guidelines.

19      (5)  <u>The Defendant's Prior Record</u>.  The defendant requests disclosure of his prior record.

20  Fed. R. Crim. P. 16(a)(1)(B).

21      (6)  <u>Any Proposed 404(b) Evidence</u>.  The government must produce evidence of prior similar acts

22  under Fed. R. Crim. P. 16(a)(1)(C) and Fed. R. Evid. 404(b) and 609.  In addition, "upon request of the

23  accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the general nature" of

24  any evidence the government proposes to introduce under Fed. R. Evid. 404(b) at trial and the purpose for

25  which introduction is sought.  This applies not only to evidence which the government may seek to introduce

26  in its case-in-chief, but also to evidence which the government may use as rebuttal.  <u>See</u> <u>United States v.</u>

27  <u>Vega</u>, 188 F.3d 1150 (9th Cir. 1999).  The defendant is entitled to "reasonable notice" so as to "reduce

28

1  surprise," preclude "trial by ambush" and prevent the "possibility of prejudice." Id.; United States v. Perez-
2  Tosta, 36 F.3d 1552, 1560-61 (11th Cir. 1994).  Mr. Garcia-Gonzalez requests such reasonable notice at least
3  two weeks before trial, so as to adequately investigate and prepare for trial.

4          (7)     Evidence Seized.  The defendant requests production of evidence seized as a result of any
5  search, either warrantless or with a warrant.  Fed. R. Crim. P. 16(a)(1)(C).

6          (8)     Request for Preservation of Evidence.  The defendant specifically requests the preservation
7  of any and all physical evidence that may be destroyed, lost, or otherwise put out of the possession, custody,
8  or care of the government, and which relates to the arrest, or the events leading to the arrest, in this case.  This
9  request includes, but is not limited to, the results of any fingerprint analysis, the vehicle which the defendant
10  drove, the defendant's personal effects, any effects found within the vehicle, any evidence seized from the
11  defendant, or any third party in relation to this case, and all audio or video recordings of Mr. Garcia-Gonzalez
12  or any third parties related, directly or indirectly, to this case.

13          (9)     Henthorn Evidence.  Mr. Garcia-Gonzalez requests that the Assistant United States Attorney
14  assigned to this case oversee a review of all personnel files of each agent involved in the present case for
15  impeachment material.  Kyles, 514 U.S. at 419; United States v. Henthorn, 931 F.2d 29 (9th Cir. 1991);
16  United States v. Lacy, 896 F. Supp. 982 (N.D. Ca. 1995).  At a minimum, the prosecutor has the obligation
17  to inquire of his agents in order to ascertain whether or not evidence relevant to veracity or other
18  impeachment exists.

19          (10)    Tangible Objects.  The defendant requests the opportunity to weigh the narcotics, to inspect
20  and copy, as well as test, if necessary, all other documents and tangible objects, including photographs, books,
21  papers, documents, fingerprint analyses, vehicles, or copies of portions thereof, which are material to the
22  defense, or intended for use in the government's case-in-chief, or were obtained from or belong to the
23  defendant.  Fed. R. Crim. P. 16(a)(1)(C).  Specifically, to the extent they were not already produced, the
24  defendant requests copies of all photographs in the government's possession of the vehicle, the defendants,
25  and any other photos taken in connection with this case.  **Additionally, Mr. Garcia-Gonzalez moves this**
26  **court to order the government to allow defense counsel to view, inspect, and copy Mr. Garcia-Gonzalez'**
27  **A-file and the A-file of the material witnesses.**

28

(11) <u>Expert Witnesses</u>. The defendant requests the name, qualifications, and a written summary of the testimony of any person that the government intends to call as an expert witness during its case-in-chief. Fed. R. Crim. P. 16(a)(1)(E). The defense requests that notice of expert testimony be provided at a minimum of three weeks prior to trial, so that the defense can properly prepare to address and respond to this testimony, including obtaining its own expert and/or investigating the opinions and credentials of the government's expert. The defense also requests a hearing in advance of trial to determine the admissibility of qualifications of any expert. <u>See</u> <u>Kumho v. Carmichael Tire Co.</u>, 119 S. Ct. 1167, 1176 (1999) (trial judge is "gatekeeper" and must determine reliability and relevancy of expert testimony and such determinations may require "special briefing or other proceedings . . ..").

(12) <u>Reports of Scientific Tests or Examinations</u>. Pursuant to Fed. R. Crim. P. 16(a)(1)(F), Mr. Garcia-Gonzalez requests disclosure and the opportunity to inspect, copy, and photograph the results and reports of all tests, examinations, and experiments conducted upon the evidence in this case, including, but not limited to, any fingerprint testing done upon any evidence seized in this case, that is within the possession, custody, or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government, and that are material to the preparation of the defense or are intended for use by the government as evidence in chief at the trial.

(13) <u>Evidence of Bias or Motive to Lie</u>. The defendant requests any evidence that any prospective government witness is biased or prejudiced against the defendant, or has a motive to falsify or distort his or her testimony.

(14) <u>Impeachment Evidence</u>. The defendant requests any evidence that any prospective government witness has engaged in any criminal act whether or not resulting in a conviction, and whether any witness has made a statement favorable to the defendant. <u>See</u> Fed. R. Evid. 608, 609 and 613; <u>Brady v. Maryland</u>.

(15) <u>Evidence of Criminal Investigation of Any Government Witness</u>. The defendant requests any evidence that any prospective witness is under investigation by federal, state or local authorities for any criminal conduct.

1     (16)   <u>Evidence Affecting Perception, Recollection, Ability to Communicate, or Truth Telling</u>. The

2 defense requests any evidence, including any medical or psychiatric report or evaluation, that tends to show

3 that any prospective witness' ability to perceive, remember, communicate, or tell the truth is impaired, and

4 any evidence that a witness has ever used narcotics or other controlled substance, or has ever been an

5 alcoholic.

6     (17)   <u>Jencks Act Material</u>. The defendant requests production in advance of trial of all material,

7 including any tapes, which the government must produce pursuant to the Jencks Act, 18 U.S.C. § 3500;

8 Fed. R. Crim. P. 26.2. Advance production will avoid the possibility of delay at the request of the defendant

9 to investigate the Jencks material. A verbal acknowledgment that "rough" notes constitute an accurate

10 account of the witness' interview is sufficient for the report, or notes, to qualify as a statement under

11 section 3500(e)(1). <u>Campbell v. United States</u>, 373 U.S. 487, 490-92 (1963); <u>see also</u> <u>United States v.</u>

12 <u>Boshell</u>, 952 F.2d 1101 (9th Cir. 1991) (holding that where an agent goes over interview notes with subject

13 interview notes are subject to Jencks Act).

14     (18)   <u>Giglio Information</u>. Pursuant to <u>Giglio v. United States</u>, 405 U.S. 150 (1972), the defendant

15 requests all statements and/or promises, express or implied, made to any government witnesses, in exchange

16 for their testimony in this case, and all other information which could arguably be used for the impeachment

17 of any government witness.

18     (19)   <u>Agreements Between the Government and Witnesses</u>. In this case, the defendant requests

19 identification of any cooperating witnesses, who have committed crimes, but were not charged, so that they

20 may testify for the government in this case. The defendant also requests discovery regarding any express or

21 implicit promise; understanding; offer of immunity; past, present, or future compensation; or any other kind

22 of agreement or understanding, including any implicit understanding relating to criminal or civil income tax,

23 forfeiture or fine liability between any prospective government witness and the government (federal, state

24 and/or local). This request also includes any discussion with a potential witness about, or advice concerning,

25 any contemplated prosecution, or any possible plea bargain, even if no bargain was made, or the advice not

26 followed. **Mr. Garcia-Gonzalez further requests disclosure of <u>all</u> arrangements between the material**

27 **witness and the government.**

28

1    Pursuant to <u>United States v. Sudikoff</u>, 36 F.Supp.2d 1196 (C.D. Cal. 1999), the defense requests <u>all</u>

2  statements made, either personally or through counsel, <u>at any time</u>, which relate to the witnesses' statements

3  regarding this case, any promises -- implied or express -- regarding punishment/prosecution or detention of

4  these witnesses, any agreement sought, bargained for, or requested on the part of the witness at any time.

5    (20)   <u>Informants and Cooperating Witnesses</u>.  To the extent that there was any informant, or any

6  other tip leading to a TECS hit in this case, the defendant requests disclosure of the names and addresses of

7  all informants, or cooperating witnesses, used, or to be used, in this case, and in particular, disclosure of any

8  informant who was a percipient witness in this case, or otherwise participated in the crime charged against

9  Mr. Garcia-Gonzalez.  The government must disclose the informant's identity and location, as well as the

10  existence of any other percipient witness, unknown or unknowable, to the defense.  <u>Roviaro v. United States</u>,

11  353 U.S. 53, 61-62 (1957).  The government must disclose any information derived from informants, which

12  exculpates, or tends to exculpate, the defendant.

13    (21)   <u>Bias by Informants or Cooperating Witnesses</u>.  The defendant requests disclosure of any

14  information indicating bias on the part of any informant or cooperating witness.  <u>Giglio v. United States</u>.

15  Such information would include what, if any, inducements, favors, payments, or threats were made to the

16  witness to secure cooperation with the authorities.

17    (22)   <u>Residual Request</u>.  Mr. Garcia-Gonzalez intends, by this discovery motion, to invoke his

18  rights to discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the

19  Constitution and laws of the United States.  Mr. Garcia-Gonzalez requests that the government provide his

20  attorney with the above-requested material sufficiently in advance of trial to avoid unnecessary delay prior

21  to cross-examination.

**III.**

**<u>MOTION TO RELEASE GRAND JURY TRANSCRIPTS</u>**

24    Mr. Garcia-Gonzalez moves this Court to compel the government to produce all grand jury

25  transcripts in this case.  <u>See</u> U.S. CONST. AMENDS V & VI[2].  Federal Rule of Criminal Procedure 6(e)(3)(E)(ii)

26  _____

27    [2] The Supreme Court has found that "[t]he grand jury is an integral part of our constitutional
heritage which was brought to this country with the common law.  The Framers, most of them

1   allows disclosure "at the request of a defendant who shows that a ground may exist to dismiss the indictment

2   because of a matter that occurred before the grand jury." In this case, release of the grand jury transcripts is

3   appropriate because: one, it is likely that the government misinstructed the grand jury on "bring to" liability

4   in light of United States v. Lopez, 484 F.3d 1186 (9th Cir. 2007) (en banc); and two, it is likely that there will

5   be a fatal variance between the theory of liability presented to the grand jury and the evidence that will be

6   presented before the petit jury.

7          Regarding the first issue, in Lopez, the Ninth Circuit set forth the analytical model to be applied in

8   analyzing whether a defendant acting entirely within the United States may be thought to have aided and

9   abetted another actor in bringing aliens to the United States in violation of 8 U.S.C. § 1324(a)(2), and 18

10  U.S.C. § 2.

11         The mere act of picking up aliens at a location near the border and transporting them within
           the United States is not sufficient to support a conviction for aiding and abetting a 'brings
12         to' offense.

13  Id. at 1199-1200 (footnote omitted).    The Lopez Court thoroughly examined the statutes at issue and

14  determined that:

15         [o]n a plain reading of the statutory language, then, a person who moves aliens from one
           location in the United States to another has not brought the aliens "to" the United States,
16         has not acted extraterritorially, and has not committed a "brings to" offense. He has acted
           entirely on domestic soil and has committed only a "transports within" offense.

17

18

19  ───────────────────────

    trained in the English law and traditions, accepted the grand jury as a basic guarantee of individual
20  liberty . . . the grand jury continues to function as a barrier to reckless or unfounded charges. 'Its
    adoption in our Constitution as the sole method for preferring charges in serious criminal cases
21  shows the high place it held as an instrument of justice.' Costello v. United States, 350 U.S. 359,
    362 (1956). Its historic office has been to provide a shield against arbitrary or oppressive action,
22  by insuring that serious criminal accusations will be brought only upon the considered judgment of
    a representative body of citizens acting under oath and under judicial instruction and guidance. "
23  United States v. Manduano, 425 U.S. 564, 571 (1976). In order to ensure that the criminally accused
    are safeguarded from reckless and unfounded charges, judges must take their duty to provide
24  guidance seriously and not simply pay lip service to the assurances of the government. It is curious
    why the government, in this district in particular, fights so hard to keep grand jury proceedings
25  sealed. Interestingly, in many cases, the "witness" who "testifies" before the grand jury is a border
    patrol agent who neither participated in the arrest or the investigation. He is only called to read a
26  report which has been prepared by others. Such a practice does not allow for the considered
27  judgment of grand jurors. Thus, the release of transcripts is appropriate.

28

1  484 F.3d at 1195.  Honoring the statutory scheme set forth in section 1324, in which several offenses with

2  varying penalties are set forth, <u>Lopez</u> held that "the 'brings to' offense does not continue beyond the point at

3  which the 'transports [wholly] within' offense begins."  <u>See id.</u> at 1196 (brackets in original, footnote omitted).

4  <u>Lopez</u> thus "permit[s] prosecution of the secondary wrongdoers -- those who act entirely in the United States

5  -- only under the 'transports within' provision ...."  <u>See id.</u> at 1197.  Thus, an individual who is alleged to have

6  acted entirely within this country, cannot be liable as a principal in a "brings to" offense unless that individual

7  is guilty as an aider and abettor.  <u>See id.</u> at 1191.

8       The government in <u>Lopez</u> offered two theories of aiding and abetting liability.  First, it argued that

9  the brings to offense continued until the aliens' reached their "immediate destination."  <u>See id.</u> at 1191.  This

10  theory, however, was flatly rejected by <u>Lopez</u> as having "little basis in the law."  <u>See id.</u> at 1197.

11       Second, the government argued that "aiding and abetting liability was established by its showing that

12  prior to the termination of the offense the defendant acted in a fashion that enabled or encouraged others to

13  commit [the 'brings to'] offense."  <u>See id.</u> at 1191.  <u>Lopez</u> found that this theory was legally tenable, but not

14  on the <u>Lopez</u> facts.  <u>See id</u>. at 1199-1201 & n.18.  Specifically, <u>Lopez</u> found that "the termination point of

15  the 'brings to' offense as the end of the initial wrongdoer's physical involvement...."  <u>See id.</u> at 1197.

16       The facts in <u>Lopez</u> are quite similar to those presented here.  The government alleges that

17  Mr. Garcia-Gonzalez, like Ms. Lopez, picked up a group of aliens who had already been brought to the

18  United States and who were awaiting transportation.  <u>See id.</u> at 1189.  In <u>Lopez</u>, the guide dropped off the

19  group, <u>see id.</u>, while, in the instant case, the government alleges that the guide continued on with the group.

20  Ultimately, there can be no meaningful distinction between "dropping off" the aliens and terminating active

21  involvement in the transportation.  <u>Lopez</u> holds that "[t]he mere act of picking up aliens at a location near the

22  border and transporting them within the United States is not sufficient to support a conviction for aiding and

23  abetting a 'brings to' offense."  <u>See id.</u> at 1199-1200.  Drawing a distinction between an initial transporter who

24  drops off the aliens and an initial transporter who ceases active transportation will necessarily contravene that

25  holding: under such a reading, the rule would be "[t]he mere act of picking up aliens at a location near the

26  border and transporting them within the United States is not sufficient to support a conviction for aiding and

27  abetting a 'brings to' offense [unless the initial transporter comes along for the ride]."

28

1    Moreover, such a reading would undercut the Congressional goal of differentiating between initial

2    and secondary transporters.

3        The construction of § 1324 most consistent with the statute's history and structure ... is one
         that recognizes that the different provisions of § 1324 cover different groups of
4        wrongdoers. By designating the termination point of the 'brings to' offense as the end of
         the initial wrongdoer's physical involvement and by permitting prosecution of the
5        secondary wrongdoers -- those who act entirely in the United States -- only under the
         'transports within' provision, our construction accomplishes precisely what Congress
6        intended.

7    Id. at 1197.  Drawing a distinction between secondary transporters who also transport guides and those

8    secondary transporters who do not transport guides frustrates that purpose erases the very distinction that

9    Congress sought to create.  Moreover, it does so based upon a factor that the transporter is unlikely to have

10   any influence over, the guide's decision as to whether he wishes to be transported within the United States.

11       Even if the guide's initial transport conduct were to be considered ongoing in some sense, that need

12   not result in extending "brings to" liability to Mr. Garcia-Gonzalez's alleged "transports within" conduct.

13   Lopez reaffirmed the vitality of the holding in United States v. Vowiell, 869 F.2d 1264 (9th Cir. 1989), that

14   the fact that an escapee's liability was continuing until he was apprehended or surrendered did not mean that

15   the crime of assisting an escape persisted as long, particularly in light of the fact that Congress passed a

16   separate statute that condemned harboring an escapee.  See Lopez, 484 F.3d at 1195 (citing Vowiell, 869 F.2d

17   at 1268).  In fact, the Supreme Court has recognized that crimes involving unlawful "entry" are not continuing

18   offenses, "as 'entry' is limited to a particular locality and hardly suggests continuity."  United States v. Cores,

19   356 U.S. 405, 408 n.6 (1958).  Accord United States v. Rodriguez-Rodriguez, 453 F.3d 458, 460 (7th Cir.

20   July 6, 2006) (following Cores); United States v. Rincon-Jimenez, 595 F.2d 1192, 1194 (9th Cir. 1979).

21       Thus, in order to ensure that the government did not misinstruct the grand jury, release of the grand

22   jury transcripts is appropriate.

23                                   **IV.**

24          **MOTION TO COMPEL THE GOVERNMENT
             TO PROVIDE A BILL OF PARTICULARS**

25

26       If this Court denies the above motion to compel the production of grand jury transcripts, then

27   Mr. Garcia-Gonzalez moves this Court to direct the government to file a bill of particulars.  See Fed. Rule

28

1   Crim. Pro. 7(f).  A bill of particulars is warranted where it will enable adequate preparation of the defense

2   and prevent surprise at trial.  United States v. Giese, 597 F.2d 1170, 1180 (9th Cir. 1979).  A bill of

3   particulars provides a defendant with the details of the charges necessary to present a defense, to avoid

4   prejudicial surprise at trial, and to protect against a second prosecution based on the same facts.  See United

5   States v. Cecil, 608 F.2d 1294, 1296 (9th Cir. 1979) (noting also that a bill of particulars ensures that the

6   defendant is tried on the basis of facts presented to a grand jury).  Mr. Garcia-Gonzalez has rights under the

7   Fifth and Sixth Amendments and Fed. R. Crim. P. 7(f) to notice of the charges against him and to a fair trial

8   with an opportunity to defend himself against the charges.  In addition, a bill of particulars guarantees a

9   defendant's Fifth Amendment right to be tried on a charge found by a Grand Jury, as a defendant is entitled

10  to know the Government's theory as to a particular count.  See Yeargain v. United States, 314 F.2d 881, 882

11  (9th Cir. 1963).  This is true even where the indictment states all the ingredients of the offense.  Myers v.

12  United States, 15 F.2d 977, 983 (8th Cir. 1926) ("The office of a bill of particulars attaches without

13  distinction, where the indictment states all the ingredients of the offense and further detail may be required

14  or demanded for the protection of the defendant").  See also United States v. Thompson, 189 F. 838, 839

15  (W.D.Va. 1911) ("An indictment may be so expressed as to be good on demurrer and which still does not give

16  the defendant all the information which he should in fairness have in order to properly prepare for trial, and

17  in such case the defects in the indictment, in Federal practice, may be overcome by a bill of particulars").

18         In this case, Mr. Garcia-Gonzalez has no idea how the government will attempt to prove the elements

19  of Counts One, Three, and Five, that he "did bring to the United States [the material witnesses] for purposes

20  of commercial advantage and private financial gain...."  Nothing in the indictment provides sufficient notice

21  of how Mr. Garcia-Gonzalez is linked to these counts, and the government has not produced any discovery

22  linking Mr. Garcia-Gonzalez to the material witnesses' entry.  In the absence of a bill of particulars,

23  Mr. Garcia-Gonzalez is not in a position to adequately prepare to defend this seemingly baseless allegation

24  at trial.  Accordingly, Mr. Garcia-Gonzalez moves this Court to order the government to produce a bill of

25  particulars explaining its theory of liability on these counts.

26  //

27  //

28

**V.**

**THE STOP OF MR. GARCIA-GONZALEZ WAS ILLEGAL AND ALL FRUITS MUST BE SUPPRESSED, INCLUDING ANY STATEMENTS, PHYSICAL EVIDENCE AND IDENTIFICATION BY DEPUTY MARENTES**

Temporary detention of individuals by the police, even if only for a brief period and for a limited purpose, constitutes a "seizure" within the meaning of the Fourth Amendment, and must be supported by at least reasonable suspicion. See Delaware v. Prouse, 440 U.S. 648, 653 (1979); United States v. Martinez-Fuerte, 428 U.S. 543, 556 (1976). An officer may stop a person if the officer believes that the person was, is, or will be engaged in criminal activity. United States v. Hensley, 469 U.S. 221, 229 (1985). "To [stop and] detain a suspect, a police officer must have reasonable suspicion, or 'specific articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity.'" United States v. Michael R., 90 F.3d 340, 346 (9th Cir. 1996). The articulable facts may not be the "mere subjective impressions of a particular officer." Id. Moreover, an officer may not base his suspicion upon "broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped." Id.

The facts as indicated in the discovery provided thus far do not indicate that there was *any* reasonable suspicion to believe that Mr. Garcia-Gonzalez was stopped for any reason other than his Hispanic appearance. Detention based solely on racial factors is an egregious violation of the Fourth Amendment. Therefore, this Court should suppress all evidence (including statements, physical evidence, and the alleged identification by Deputy Marentes) arising from the illegal detention.[3]

**A.      Agents Had No Reasonable Suspicion to Stop and Question Mr. Garcia-Gonzalez**

In Brignoni-Ponce, the Supreme Court held that "Hispanic appearance alone is insufficient to justify a stop." 422 U.S. 873, 886-887 (1975). The Ninth Circuit has held that a stop based solely on a person's Hispanic appearance was so egregious a constitutional violation this it required suppression of the evidence obtained as a result of the stop. Gonzalez-Rivera v. INS, 22 F.3d 1441 (9th Cir. 1994). In Gonzalez-Rivera

---

[3] At the very least, this Court should hold an evidentiary hearing to require the Government to prove reasonable suspicion to justify the stop.

1  the Ninth Circuit found a stop based solely on Hispanic appearance warrants application of the exclusionary

2  rule under the Fourth Amendment, even in a civil deportation hearing.  See Gonzalez-Rivera, 22 F.3d at 1447.

3  The Ninth Circuit also suppressed evidence in Orhorhaghe v. INS in which the illegal seizure was race-based,

4  namely a "Nigerian-sounding" name.  See Orhorhaghe v. INS, 38 F.3d 488 (9th Cir. 1994).  Additionally, in

5  Nicacio v. INS, the Ninth Circuit held that "Hispanic looking appearance and presence in an area where

6  illegal aliens frequently travel are not enough to justify a stop to interrogate the occupants of a vehicle."  See

7  Nicacio v. INS, 797 F.2d 700, 703(9th Cir. 1986).  The Supreme Court and Ninth Circuit have been clear,

8  when a race based egregious Fourth Amendment violation led to the seizure, the resulting evidence, including

9  identity evidence, must be suppressed.  See Brignoni-Ponce, 422 U.S. 873, 886-887 (1975); see Nicacio v.

10 INS, 797 F.2d 700, 703 (9th Cir. 1986); see Orhorhaghe v. INS, 38 F.3d 488 (9th Cir. 1994); see Gonzalez-

11 Rivera v. INS, 22 F.3d 1441 (9th Cir. 1994).

12         In this case, the government will not be able to point to anything that Agent Wallace relied on, other

13 race, to show reasonable suspicion.  According to information provided by the government, the only basis

14 for stopping Mr. Garcia-Gonzalez was his appearance, his brisk walk, his use of a cell phone and his enlarged

15 eyes which, according to Agent Wallace's assumptions, meant surprise.  This evidence is weak and does not

16 rise to the requisite level of individualized suspicion required under the Fourth Amendment to seize and

17 detain a person.  Thus, the Agent Wallace lacked reasonable suspicion to stop Mr. Garcia-Gonzalez.

18 **B.      All Fruits of the Illegal Seizure Must Be Suppressed**

19         All physical evidence and statements of a defendant must be suppressed when they are fruits of an

20 illegal stop which violates the Fourth Amendment.  See Wong Sun v. United States, 371 U.S. 471 (1963)

21 (ruling that evidence obtained as a result of government impropriety must be excluded).  Here, Mr. Garcia-

22 Gonzalez' statements to Agent Wallace, his post-Miranda interrogation and the alleged identification by

23 Deputy Marentes only came about because of the illegal stop.  Although the government may argue that the

24 "the more apt question in such a case is 'whether, granting establishment of the primary illegality, the

25 evidence to which instant objection is made has been come at by exploitation of that illegality or instead by

26 means sufficiently distinguishable to be purged of the primary taint'.  United States v. Chamberlin, 644 F.2d

27 1262, 1267 (9th Cir. 1980) citing Wong Sun v. United States, 371 U.S. 471, 487-88 (1963), nothing in the

28

1  discovery thus far supports a "purge of the primary taint." See United States v. Johns, 891 F.2d 243, 245 (9th

2  Cir. 1989)(it is the government's burden to show that the evidence is not "the fruit of the poisonous tree"

3  requiring suppression).  Therefore, all evidence must be suppressed.

4       **1.**     **At a Minimum, Statements Should Be Suppressed**

5       In U.S. v. Wong Sun, the Supreme Court concluded that evidence and witnesses discovered as the

6  result of an illegal search, in violation of the Fourth Amendment, must be excluded from evidence.  See

7  generally U.S. v. Wong Sun,  371 U.S. 471, 487 (1963).  The "Wong Sun doctrine applies as well when the

8  fruit of the Fourth Amendment violation is a confession." Oregon v. Elstad, 470 U.S. 298, 306 (1985).  It is

9  settled law that "a confession obtained through custodial interrogation after an illegal arrest should be

10 excluded unless intervening events break the causal connection between the illegal arrest and the confession

11 so that the confession is 'sufficiently an act of free will to purge the primary taint.' " Taylor v. Alabama, 457

12 U.S. 687, 690 (1982) (quoting Brown v. Illinois, 422 U.S. 590, 602(1975)).

13      The administration of Miranda warnings after the occurrence of the Fourth Amendment illegality

14 and before the defendant's admission does not alone, purge the taint of the Fourth Amendment violation. See

15 Brown v. Illinois, 422 U.S. 590, 601 (1975). Moreover, a post-Miranda confession's voluntary nature does

16 not purge the taint of an illegal arrest. Lanier v. South Carolina, 474 U.S. 25, 25 (1985).  "When there is a

17 close causal connection between the illegal seizure and the confession, not only is exclusion of the evidence

18 more likely to deter similar police misconduct in the future, but use of the evidence is more likely to

19 compromise the integrity of the courts." United States v. Chamberlin, 644 F.2d 1262, 1268 (9th Cir. 1980)

20 citing to Dunway v. New York 442 U.S. 200, 217(1979).

21      The stop of Mr. Garcia-Gonzalez was illegal and in violation of the Fourth Amendment.  After

22 stopping Mr. Garcia-Gonzalez, Agent Wallace displayed his badge and proceeded to question Mr. Garcia-

23 Gonzalez.  As a direct result or fruit of that stop, Agent Wallace took Mr. Garcia-Gonzalez into custody

24 where Mr. Garcia-Gonzalez was further questioned about his citizenship, whether or not he was legally within

25 the United States and his involvement with the Suburban.  There was no "intervening event" to "break the

26 causal connection between the illegal arrest and the confession."  Taylor v. Alabama, 457 U.S. 687, 690

27 (1982) (quoting Brown v. Illinois, 422 U.S. 590, 602(1975)).  Even though agents later determined they

28

1  would advise Mr. Garcia-Gonzalez of his <u>Miranda</u> rights, this still did not purge the taint of the illegal stop.

2  The agents cannot simply purge the taint of the Fourth Amendment by reading <u>Miranda</u> warnings after the

3  illegality.  <u>See</u> <u>Brown v. Illinois</u>, 422 U.S. 590, 601 (1975); <u>see also</u> <u>Lanier v. South Carolina</u>, 474 U.S. 25,

4  25 (1985).   These questions were an immediate result of the illegal stop.  There was no intervening event

5  which broke the "causal connection" between the illegal stop and the statements or confession.  The illegal

6  stop led directly to the statements made in response to Agent Wallace's commands. Further questioning, even

7  post-Miranda, does not purge the taint.  For these reasons, Mr. Garcia-Gonzalez' statements must be

8  suppressed as a fruit of the illegal stop.

9                                          **VI.**

10                         <u>**MOTION TO SUPPRESS STATEMENTS**</u>

11          Mr. Garcia-Gonzalez moves to suppress any and all statements made at the time of his arrest on the

12  grounds that his <u>Miranda</u> waiver was not knowing, intelligent, and voluntary.  Moreover, Mr. Garcia-

13  Gonzalez moves to suppress any other statements made on the grounds that those statements were not made

14  voluntarily.

15  **A.      The Government Must Demonstrate Compliance with <u>Miranda</u>.**

16          In order for any statements made by Mr. Garcia-Gonzalez to be admissible against him, the

17  government must demonstrate that they were obtained in compliance with <u>Miranda v. Arizona</u>, 384 U.S. 436

18  (1966).  Specifically, the government must establish that Mr. Garcia-Gonzalez waived his rights and that any

19  waiver of his <u>Miranda</u> rights was voluntary, knowing, and intelligent.  <u>See</u> <u>Schneckloth v. Bustamonte</u>, 412

20  U.S. 218 (1973).  When an interrogation continues without the presence of an attorney, and a statement

21  results, the government has a heavy burden to demonstrate that the defendant has intelligently and voluntarily

22  waived his privilege against self-incrimination.  <u>Miranda</u>, 384 U.S. at 475.  The court must indulge every

23  reasonable presumption against waiver of fundamental constitutional rights, so the burden on the government

24  is great.  <u>United States v. Heldt</u>, 745 F. 2d 1275, 1277 (9th Cir. 1984).

25

26

27

28

1.   *Miranda* **Warnings Must Precede Custodial Interrogation**.

The prosecution may not use statements, whether exculpatory or inculpatory, stemming from a custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.  Miranda v. Arizona, 384 U.S. 436, 444 (1966).  Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.  Id.

2.   **Mr. Garcia-Gonzalez was Asked Questions to Elicit an Incriminating Response Without *Miranda* Rights Being Given**.

An officer's obligation to give a suspect *Miranda* warnings before interrogation extends only to those instances where the individual is "in custody." Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (per curiam). Mr. Garcia-Gonzalez was in custody once he was stopped by Agent Wallace.  A suspect is "in custody" if the actions of the interrogating officers and the surrounding circumstances, fairly construed, would reasonably have led him to believe he could not freely leave.  See United States v. Lee, 699 F.2d 466, 468 (9th Cir. 1982); United States v. Bekowies, 432 F.2d 8, 12 (9th Cir. 1970).  To determine whether an individual was in custody, a court must, after examining all of the circumstances surrounding the interrogation, decide "whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Stansbury v. California, 511 U.S. 318, 322 (1994) (internal quotation marks omitted).  The inquiry focuses on the objective circumstances of the interrogation, not the subjective views of the officers or the individual being questioned.  Id. at 323.  Thus, the issue is whether "the officers established a setting from which a reasonable person would believe that he or she was not free to leave." United States v. Beraun-Panez, 812 F.2d 578, 580 (9th Cir.), modified by 830 F.2d 127 (9th Cir. 1987).

In determining whether suspects were "in custody" for Miranda purposes, the voluntary nature of the encounter and any understanding that questioning would ensue is also taken into account.  See California v. Beheler, 463 U.S. 1121, 1125 (1982) (per curiam) (holding that defendant was not in custody when he agreed to accompany police to the station to answer questions and was allowed to leave immediately afterward); United States v. Mathiason, 429 U.S. at 495 (holding that defendant was not in custody when he came to the station voluntarily and left "without hindrance" after 30 minutes of questioning).  Recently in

1  United States v. Kim, 292 F.3d 971, 973 (9th Cir. 2002),[4] the Ninth Circuit noted that the following factors

2  are to be considered in deciding whether or not a police-dominated atmosphere exists: "(1) the language used

3  to summon the individual;  (2) the extent to which the defendant is confronted with evidence of guilt;  (3) the

4  physical surroundings of the interrogation;  (4) the duration of the detention;  and (5) the degree of pressure

5  applied to detain the individual."  Id. (citations omitted); see also  United States v. Estrada-Lucas, 651 F.2d

6  1261, 1265 (9th Cir. 1980), (in context of custody at border "[t]he factors to be weighed are the language used

7  to summon him, the physical surroundings of the interrogation, the extent to which he is confronted with

8  evidence of his guilt, and the pressure exerted to detain him."  The Ninth Circuit also recognizes that

9  "question[s] implying that [the agent] suspected [the defendant] of  criminal activity" can give rise to a

10  reasonable belief that one is not free to ignore the questions and leave.  United States v. Chavez-Valenzuela,

11  268 F.3d 719, 725 (9th Cir. 2001).[5]

12       It is not necessary that an individual be physically restrained in any fashion.  In Beraun-Panez, the

13  Ninth Circuit found that an individual questioned out in an open field who was neither held nor handcuffed

14  nor told that he was under arrest was nonetheless in custody for *Miranda* purposes.  Beraun-Panez held that

15  "[a]lthough not physically bound, Beraun-Panez was subjected to psychological restraints just as binding."

16  812 F.2d at 580.[6]  Certainly, when Agent Wallace stopped Mr. Garcia-Gonzalez, flashed his badge and

17  restrain his further movement, it is inherent that he would feel he is not free to leave.  At this point, no

18  reasonable person would feel free to leave under such circumstances.  Agent Wallace interrogated Mr. Garcia-

19

20

---

21       [4]  In Kim, the Ninth Circuit found that a Korean woman who went to her own store,
22  voluntarily, because an officer's visit prompted her to do so was in custody even though she was in
    familiar surroundings because the police "temporarily took over complete control of Kim's store
23  creating a 'police-dominated atmosphere."  292 F.3d at 977.  This combined with difficulty with
    English and isolation from family supported the finding that Kim did not willingly agree to submit
24  to an encounter with the police.  Id.

25       [5]  Chavez-Valenzuela involved a roadside stop of a motorist on a public street, out in the
26  open.

27       [6]  The police confronted Beraun-Panez with his alienage, accused him of lying and kept him
    separated from his co-worker in a remote rural area.  Beraun-Panez, 812 F.2d at 580.

28

1  Gonzalez hoping that he would elicit incriminating statements, which Mr. Garcia-Gonzalez did in fact make

2  in response to his interrogation.

3  **B.      Mr. Garcia-Gonzalez's Statements Must Be Voluntary.**

4         Even if this Court determines that Mr. Garcia-Gonzalez validly waived his <u>Miranda</u> rights or that

5  <u>Miranda</u> rights were not required, it must still make a determination that any statements are voluntary.  In

6  determining whether a waiver is voluntary, knowing, and intelligent, the court looks to the totality of the

7  circumstances surrounding the case. <u>Edwards v. Arizona</u>, 451 U.S. 477 (1981); <u>United States v. Garibay</u>, 143

8  F.3d 534 (9th Cir. 1998).  The Ninth Circuit has held that determination of the validity of a <u>Miranda</u> waiver

9  requires a two prong analysis:  the waiver must be both (1) voluntary and (2) knowing and intelligent.

10 <u>Derrick v. Peterson</u>, 924 F. 2d 813 (9th Cir. 1990).  The second prong requires an inquiry into whether "the

11 waiver [was] made with a full awareness both of the nature of the right being abandoned and the

12 consequences of the decision to abandon it." <u>Id.</u> at 820-821 (quoting <u>Colorado v. Spring</u>, 479 U.S. 564, 573

13 (1987)).   Not only must the waiver be uncoerced, then, it must also involve a "requisite level of

14 comprehension" before a court may conclude that <u>Miranda</u> rights have been legitimately waived. <u>Id.</u> (quoting

15 <u>Colorado v. Spring,</u> 479 U.S. at 573).  Unless and until <u>Miranda</u> warnings and a knowing and intelligent

16 waiver are demonstrated by the prosecution, no evidence obtained as a result of the interrogation can be used

17 against the defendant.  <u>Miranda</u>, 384 U.S. at 479.  The government in this case must prove that Mr. Garcia-

18 Gonzalez waived his rights intelligently and voluntarily.  Mr. Garcia-Gonzalez disputes any allegation that

19 his waiver was knowing, intelligent, and voluntarily.

20        Under 18 U.S.C. § 3501(a), this Court is required to determine, whether any statements made by

21 Mr. Garcia-Gonzalez are voluntary.  In addition, section 3501(b) requires this Court to consider various

22 enumerated factors, including whether Mr. Garcia-Gonzalez understood the nature of the charges against him

23 and whether he understood his rights.  Without such evidence, this Court cannot adequately consider these

24 statutorily mandated factors.

25 **C.      <u>This Court Should Conduct An Evidentiary Hearing</u>**

26        This Court should conduct an evidentiary hearing to determine whether Mr. Garcia-Gonzalez's

27 statements should be admitted into evidence.  Under 18 U.S.C. § 3501(a), this Court is required to determine,

28

1  outside the presence of the jury, whether any statements made by Mr. Garcia-Gonzalez are voluntary.  In

2  addition, § 3501(b) requires this Court to consider various enumerated factors, including 1) the length of time

3  Mr. Garcia-Gonzalez was in custody and 2) whether Mr. Garcia-Gonzalez understood the nature of the

4  charges against him and whether he understood his rights.  Fed. R. Crim. P. 12 requires that these factual

5  determinations be supported by factual findings.  See United States v. Prieto-Villa, 910 F.2d 601, 606-10 (9th

6  Cir. 1990).  Because "'suppression hearings are often as important as the trial itself,'" id. at 610 (quoting

7  Waller v. Georgia, 467 U.S. 39, 46 (1984)), these findings must be supported by evidence.

8                                                 **VII.**

9                        **REQUEST FOR LEAVE TO FILE FURTHER MOTIONS**

10         As new information surfaces due to the government providing discovery in response to these

11  motions, or an order of this Court, defense may find it necessary to file further motions, or to supplement

12  existing motions with additional facts.  The denial of this motion will result in a violation, at a minimum, of

13  Mr. Garcia-Gonzalez's Fifth and Sixth Amendment rights.  Therefore, defense counsel requests the

14  opportunity to file further motions based upon information gained from discovery.

15                                                **VIII.**

16                                          **CONCLUSION**

17         For the reasons stated above, Mr. Garcia-Gonzalez moves this Court to grant his motions.

18                                                    Respectfully submitted,

19
     DATED:  April 3, 2008                          /s/ Michelle Betancourt
20                                                   **MICHELLE BETANCOURT**
                                                     Federal Defenders of San Diego, Inc.
21                                                   Attorneys for Mr. Garcia-Gonzalez
                                                     Michelle_Betancourt@fd.org
22

23

24

25

26

27

28